## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| LINDA LASART, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| UNUM LIFE INSURANCE COMPANY | ) |
| OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

## **COMPLAINT**

COMES NOW Plaintiff, Linda LaSart, and for her claims and causes of action against

Defendant, Unum Life Insurance Company of America, states as follows:

### PARTIES

1.    Linda LaSart ("LaSart") is a resident and citizen of the State of Kansas.

2.    Defendant Unum Life Insurance Company of America ("Unum") is an out-of-state

insurance company authorized to do business in the State of Kansas. The Commissioner

of the Kansas Department of Insurance is authorized to accept service of process on

behalf of Unum.

### JURISDICTION AND VENUE

3.    LaSart brings her claim pursuant to the Employment Retirement Income Security Act

("ERISA") and 29 U.S.C. § 1001 *et seq.*

4.    This dispute is governed by a welfare benefits plan and its policy documents, as well as

applicable federal law regarding employer provided benefits. 29 U.S.C. § 1132(e)(1).

1

5.  This Court also has subject matter jurisdiction pursuant to the general jurisdictional statute for civil actions arising under federal law. 28 U.S.C. § 1331.

6.  Venue lies in the District of Kansas under 29 U.S.C. § 1332(e)(2), as the breach occurred in this district, and because the welfare benefits plan is administered in this district.

7.  Venue is also proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to this action occurred within this judicial district.

<u>INFORMATION REGARDING TRIAL</u>

8.  No jury trial is allowed under ERISA law.

9.  Trial is to be held in Kansas City, Kansas.

<u>STATEMENTS OF FACT</u>

10. Olathe Health System, Inc., ("OHS") employed LaSart as a Registered Nurse.

11. LaSart remained actively at work until March 6, 2017.

12. During her employment, LaSart was an "active, full-time employee working in the United States."

13. During her employment, LaSart began to suffer from a number of health conditions, including ongoing complications from failed lumbar spinal fusion, osteoarthritis, spinal stenosis, scoliosis, neck surgeries, arthritis, colorectal surgery, heart issues, asthma, anxiety, and depression. These conditions eventually rendered her incapable of continuing her job on a full-time, competitive basis.

14. LaSart's former occupation was situated at the medium level according to the Dictionary of Occupational titles.

15. OHS sponsored a group long-term disability ("LTD") benefits plan ("Plan") for its participating employees.

16.     The Plan constitutes employee welfare benefit plans as defined by 29 U.S.C. § 1002 (1).

17.     The Plan offered disability benefits to qualifying OHS employee Plan participants.

18.     At all relevant times, LaSart has been a participant and covered person under the terms of the Plan.

19.     OHS is the administrator of the Plan.

20.     The Plan's disability provisions are insured by a policy written by Unum.

21.     OHS delegated or attempted to delegate the function of issuing LTD claim determinations to Unum.

22.     OHS and Unum entered into an administrative services contract through which OHS paid Unum for acting as claims administrator.

23.     LaSart attempted and failed working for the last day on March 6, 2017.

24.     Following her leave from work, LaSart applied to Unum for long-term disability ("LTD") benefits.

25.     Unum approved LaSart's LTD claim paying benefits until September 19, 2019, but closing her claim on September 20, 2019.

26.     On July 9, 2024, Unum denied LaSart's claim finding that she was no longer disabled according to her policy's terms and denying future benefits. Unum reasoned that LaSart was capable of performing the residual occupations of Information Cler, Call Center Representative, and Order Processing Clerk and was therefore not disabled according to the policy definition.

27.     The Plan and Policy articulate the conditions under which a Plan participant is entitled to LTD benefits.

28.    The Policy defines the term "Disabled" as follows:

### HOW DOES UNUM DEFINE DISABILITY?

**You are disabled when Unum determines that:**

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

**After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.**

29.

Both ERISA and the Policy itself require such denials to provide specific information, including:

    a.    The specific reason(s) the claim was denied.

    b.    Specific reference to the Policy provision(s) on which the denial was based.

    c.    Any additional information required for the claim to be reconsidered, and the reason this information is necessary.

    d.    If the case of any claim for a disability benefit, identification of any internal rule, guideline or protocol relied on in making the claim decision, and an explanation of any medically-related exclusion or limitation involved in the decision.

    e.    A statement regarding the right to appeal the decision, and an explanation of the appeal procedure, including a statement of the right to bring a civil action under Section 502(a) of ERISA if the appeal is denied.

30.    On January 3, 2025, LaSart appealed Unum's denial.

31.    In her appeal, LaSart provided medical evidence supporting her disability.

32.    On March 24, 2017, LaSart was seen by Dr. Glenn Amundson for low back and leg pain ongoing for 15 years but progressively worsening. Following a rectal prolapse and repair

4

LaSart had increased back pain and stiffness for 4-5 months. LaSart reported that she did PT in June which made her worse, tried chiropractic treatment with minimal relief, and had to go out of work on FMLA. LaSart was put on Hydrocodone for pain management following the surgery.

33.    In August 2017, LaSart underwent an epidural, with only 10% pain relief. On physical exam LaSart had decreased light touch in her entire RLE. SLR +15 degrees on the right and left at 30. She walked with an antalgic, very guarded gait.

34.    LaSart underwent imaging including an x-ray finding moderate scoliosis and spondylolisthesis L4 on 5. A Lumbar MRI and myelogram of the lumbar spine found facet arthropathy, ligament thickening, and diffuse disc bulging resulting in right greater than left lateral recess and foraminal stenosis. LaSart's 8mm canal at L2-3, L3-4 showed diffuse disc bulging, facet arthropathy, and ligament thickening resulting in a 6m canal with moderate to severe foraminal stenosis. L4-5 shows a spondylolisthesis with diffuse disc bulging, facet arthropathy, and ligament thickening resulting in a 5mm central canal severe lateral recess, and foraminal stenosis.

35.    On April 27, 2017, LaSart saw Dr. Amundson and underwent L2-5 posterior segmental instrumentation, reduction of spondylolisthesis, reduction of scoliosis, L2-3 posterior posterolateral fusion, L3-4 posterior posterolateral fusion, L4-5 posterior posterolateral fusion, bilateral laminectomy with partial facetectomy and neural foraminotomy of L2, L3, 14, 14 and S1 with fluoroscopy and a local bone graft harvest. LaSart was discharged on April 30, 2017, and prescribed Percocet and Robaxin.

36.    LaSart was seen for her post-operation visits and decreased her dosage of Percocet at those visits.

37.     On January 23, 2018, LaSart was seen by Dr. Baker for right knee pain lasting several months that became worse as she became more active since her surgery last April. LaSart reported falls and landing on their right knee both before and after surgery. LaSart reported back pain although it was improved. LaSart also reported urinary incontinence for several years which seems to be getting worse and that she was previously seen by Dr Nash who prescribed imipramine. She reported that she has had problems with urinary urgency and incontinence in the past although currently her problem is related to movement or simply standing. Her knee pain bothers her primarily with bending but also on stairs. LaSart reported that she had been having some asthma issues as her Brec copay expired. On exam, LaSart had a slight limp while walking. Dr. Baker ordered an x-ray for the knee pain, prescribed some quadricep strengthening exercises, and discussed a hinged knee brace. If the problem continued LaSart was to undergo an MRI. Imipramine was refilled but does was increased as she has taken a higher amount in the past. Her main problem with incontinence appears to be stress and she will follow up with Dr Nash. LaSart's Hydrocodone was refilled along with other medications prescribed.

38.     On April 6, 2018, LaSart was seen for back pain, reflux, ADD, menopausal symptoms, overactive bladder, and anxiety. LaSart reported that her back pain had improved since the last office visit, but that she was still having some knee pain and would like a hinged brace. LaSart reported that her neck was the most painful and that she was using Hydrocodone on a daily basis. On exam she had a skin lesion on her right foot present for several months. On review of symptoms LaSart had chronic tinnitus, some hoarseness, and feeling of fullness in her throat, occasional dysphagia, lots of break through heartburn, and trace edema. The recessed lesion on her right forefoot was suggestive of

porokeratosis. LaSart reported an upcoming appt with Dr Nash regarding her bladder symptoms. Her Prevacid was increased for heartburn treatment and she was to report back if not improved. Her neck pain was recorded and scheduled for further evaluation if it continued. LaSart was referred to podiatry for the foot lesion.

39.     On October 8, 2018, LaSart was seen for failed back syndrome, asthma hypertension, and reflux disease. She reported bloating in her abdomen after eating on a regular basis, associated pain in the right CVA area, nausea, and bluish discoloration of her feet when standing for prolonged times. LaSart was taking Detrol prescribed by Dr Nash for her bladder. She reported intermittent dizziness, hearing fluctuating on the right, continued hoarseness despite increasing the Prevacid, and mild swelling in her feet and legs. She was using her inhaler daily. LaSart's back pain is controlled but she was taking 6-7 Hydrocodone each day. On exam she had several venous varicosities in her legs, and trace edema. LaSart was referred to ENT for hoarseness, her hearing, and dizziness. Her neck pain was documented and records were requested. She was also recommended to use compression stockings. LaSart was to return in 4-6 months for annual exam.

40.     On October 15, 2018, LaSart underwent an abdominal ultrasound and additional small and large bowel anastomoses were noted.

41.     On February 12, 2019, LaSart was seen by her PCP and reported continued pain in her low back pain and neck along with problems with short-term memory. Her PCP noted osteoarthritis of the right knee, for which she wears a brace and discussed the need for her to reduce her daily use of Hydrocodone. Her PCP wanted to get a celiac antibody test as well. LaSart had some upper abdominal discomfort but did not want to do any further testing until she completed the testing ordered by NS. Her memory issues appeared mild

and could be medication-related. If the memory issues worsened LaSart was to consider neuropsychiatric testing. CT scan of the cervical spine found nonspecific straightening of the normal cervical lordosis. Multilevel degenerative changes. CT scan of her lumbar spine found a redemonstration of lucency surrounding the L5 pedicle screws suggesting loosening or infection and multilevel degenerative changes.

42. On February 15, 2019, LaSart underwent an MRI of her cervical spine for chronic neck pain radiating down both arms, which showed degenerative changes throughout the cervical spine, mind central spinal canal stenosis at C6-7, and multilevel neuroforaminal stenosis of varying severity. MRI of her lumbar spine showed degenerative disc disease throughout the lumbar spine resulting in moderate to severe left greater than right central spinal canal stenosis with moderate left neural foraminal stenosis L1-2.

43. On March 14, 2019, LaSart was seen by Dr. Amundson in a follow up for a planned anterior cervical discectomy and fusion C4-7. She reported corresponding deficits in C5 with shoulder pain and some mild dysesthesias over the shoulder. LaSart reported pain and numbness in the thumb, index, and ring finger consistent with C6 and C7 nerve root symptoms. Her current medications were Estratest HS, Adderall, Effexor, Singular, Zyrtec, Prevacid, Amlodipine, Percocet 10/325 every 4 hours as needed for pain, Norco 7.5/325 1-2 tabs every 6 hours, Prednisone, and Tizanidine HCL 4mg tablet as needed

44. On March 19, 2019, Lasart was seen by Dr. Amundson and underwent C4-5 anterior total discectomy, C5-6 anterior total diskectomy; C6 anterior total discectomy, C4 partial corpectomy, C5 partial corpectomy, C6 partial corpectomy and anterior interbody fusion, C4-5 anterior strut interbody fusion; C5-6 anterior interbody strut fusion, C6-7 insertion interbody prosthesis, C4-5 insertion interbody strut prosthesis, C5-6 insertion interbody

strut prosthesis, C6-7 posterior neural foraminal decompression, C4-5 posterior neural foraminal decompression, C5-6 posterior neural foraminal decompression, C6-7 anterior plate instrumentation, and C4-7 fluoroscopy. Following the surgery LaSart was seen by a hospitalist for medical management postop during hospitalization, was noted to have difficulty swallowing, and subcutaneous hematoma/edema at the surgical site postop. She was noted to have an improvement of her dysphagia, and was discharged on her home medications of oxycodone, tizanidine, and Benadryl. LaSart was discharged home with home health.

45.     On April 01, 2019, LaSart was evaluated following her cervical fusion and she reported pain was a 5/10 with occasional elevations in ratings to 8/10. Restrictions were placed on her of no manipulating over 10lbs until a month out from surgery and then increasing by 10lbs per month following. LaSart was to avoid twisting and bending.

46.     On May 1, 2019, LaSart was seen for leg swelling following the operation. She reported edema lasting since her spine surgery in March, and redness in both forearms progressing to mid arm bilaterally first noticed the day prior. Her ear intermittently felt full and yesterday she began having green nasal drainage. On exam she had erythema of sun-exposed area on forearms and arms bilaterally and 1-2 semi-pitting edema in both legs. She was treated with a week course of furosemide and potassium.

47.     On May 29, 2019, LaSart was seen for a follow up appointment, where her provider noted lifting restrictions of 15 to 20 pounds. At that visit, she was encouraged to participate in a walking program. Dr. Baker has provided ongoing work-related restrictions and limitations. LaSart also underwent cervical spine radiographs. She was taking hydrocodone 7.5/acetaminophen 325, tizanidine and Robaxin regularly.

48.     On October 9, 2019, LaSart was seen by her PCP and prescribed Pristiq, Breo Ellipta,

Lamisil, hydrocodone 7.5/acetaminophen 325, Estratest, furosemide and Detrol LA. In

addition, a pharmacy scan showed medication refills around September 2018, which

included desvenlafaxine, montelukast, and terbinafine. LaSart had developed a painful

rash in her left lower extremity a month ago and was treated with Valtrex and prednisone.

Her rash developed into skin lesions and lesions broke out on her face which were treated

with Doxycycline. She also had a recurrence of edema in the past 3 days and there was a

sore area on her left anterior leg. LaSart reported occasional mild numbness and tingling

in her left thigh. Her low back pain was unchanged. On exam she had small erythematous

papules predominantly on her chin, trace edema in both legs, a tender cord on her left

anterior leg consistent with superficial phlebitis and purplish healing lesions on her left

thigh in the L3 or L4 dermatome. Her Furosemide was refilled to use as needed for

edema and she was to continue using compression stockings. She was to elevate for the

superficial phlebitis and heat applications and was prescribed 10 days doxy for facial

rash. She was prescribed 10 days of Doxycycline for the cough and facial rash.

49.     In November 2019, LaSart fell which aggravated her back and knee pain.

50.     On March 5, 2020, LaSart was seen for an annual exam. Her chin rash had returned

following her Doxycycline treatment, and she had some recurring ulceration in her mouth

and tongue which seem to be triggered by stress. LaSart reported cough going on since

November sometimes the sputum yellow in color.

51.     On September 10, 2020, LaSart was seen by her PCP for a follow-up on failed lumbar

syndrome and other conditions. She reported problems with abdominal bloating and

constipation last month. The problem became bad enough that she thought about going to

the ER. Finally had BM with the improvement of pain and had some blood mixed in with stool. Still having some upper abdominal discomfort. LaSart did see Kristin Fink last month fer her itching and was given several meds and recommendations. She had reduced her Effexor to 150mg daily, and tried Senokot, Colace then MiraLAX. Her back pain was about the same and her hydrocodone use had not changed. During her BM she did have some blood intermingled with the stool but has not had any further blood and the problem has improved. Her PCP did talk about prescribing Amitiza for the constipation and if it continued planned to order a CT of her abdomen and pelvis and repeat colonoscopy.

52.     On October 2, 2020, LaSart was seen by her PCP for treatment of various conditions including insomnia, suicidal thoughts, severe depression, migraine, and abdominal discomfort.

53.     On March 11, 2021, LaSart was seen by her PCP. She reported that in January she had an illness with nausea, fever, and myalgias. She stopped Zoloft as she thought it might actually be making her more anxious. She reported that she fell in April but did not seek any treatment for injuries. Earlier this month she requested an antibiotic for a dental infection and was given Amoxicillin apparently her dentition is poor and she was told she needed several implants. She reported acid burning sensation in her stomach and esophagus frequently that is worse with stress or anxiety. This combined with her poor dentition has made it difficult to eat and her weight is down 40lbs from the last visit. LaSart reported that she had low blood pressure at home and lightheadedness with near syncope. Furosemide and potassium were ordered in October for edema and she had been taking up to 2 furosemide per day several days a week because of the swelling. She does sometimes have pain in her ears and has an otoscope she can take pictures with her

phone. She showed several images in which her eardrum was dark and she thought it was blood behind the eardrum. In some pictures, the canal was erythematous in other photos everything was normal. She had noticed an area of nodularity in the left anterior neck which is asymptomatic. On ROS: She does had some chronic issues swallowing in the lower pharynx since her cervical spine surgery 2 years ago and infrequent migraines. LaSart had a 1cm nodule in the left neck that moves with swallowing and appears to be in the thyroid gland. AP notes concern for her total protein and albumin low with 40lb weight loss. She was taking Prevacid and will add Carafate and set up for ECD. Also due for colonoscopy. Malnutrition may be the cause of her edema. She was to get a urine protein to rule out kidney disease. Discussed adding Juven to her diet. She had been taking more Furosemide which in turn has led to prerenal azotemia and dehydration with episodes of low back pressure, potassium is low as well. Limit Furosemide to no more than 1 tab/day and try to use more sparingly. Dysphagia lower pharynx is probably related to previous cervical surgery contribution to nutrition and eating.

54.    On 5/27/21, LaSart was seen by her PCP for her weight loss, abdominal discomfort, malnutrition, edema, and back pain. She reported a new tremor interfering with some daily activities that require fine movement. Discussed protein intake and swelling issues, bloating and abdominal discomfort, and nausea after eating. Mild to moderate intention tremor in BUE. She had mild bruising on her forearms, and trace to 1 pitting edema bilateral legs. LaSart's total protein and albumin were better but still low and she lost another 6 lbs. Getting CT of abd/pelvis to rule out malignancy as a cause of her weight loss. CXR today suspect gastroparesis and the imipramine. She was to try a low-dose propranolol for the tremors as needed.

55.    On May 28, 2022, LaSart underwent an x-ray of her left wrist finding an acute oblique minimally displaced intraarticular fracture of the distal radius and advanced degenerative arthrosis of the 1st CMC joint

56.    On July 17, 2021, LaSart experienced a transient ischemic attack with symptoms of left sided weakness and confusion lasting 2 days. LaSart was hospitalized after working out in the yard during the night and falling to the ground. She reported that her left side was very weak, and she was tired and fell asleep. When she awoke her left side worked normally but she was extremely fatigued overall. LaSart contacted her PCP 2 days later and he recommended evaluation in the ER. While at the ER she underwent a head CT, CTA, and echocardiogram. Her symptoms were felt to be consistent with TIA. Her Amlodipine was increased to 10mg, and Atorvastin was added and prescribed for 3 weeks and ASA daily. MRI of the head was recommended as an outpatient and is being scheduled. She had developed some lesions on her right posterior thigh which was her second case of shingles and was treated with Valtrex.

57.    On August 4, 2021, LaSart underwent a CT scan of her abdomen and pelvis regions showed postoperative changes from a prior gastric bypass with a large volume of fecal matter throughout the colon. There were scattered pleural-based densities throughout, the largest measuring up to 8mm. She also underwent a thyroid ultrasound showing a simple small subcentimeter right thyroid cyst and a few tiny bilateral thyroid nodules without suspicious features.

58.    On August 14, 2021, LaSart underwent a brain MRI.

59.    On September 1, 2021, LaSart was seen by her PCP for her chronic conditions. Her BP had been elevated at home but was cut of Amlodipine for the past week. Breo seemed to

help her dyspnea however she needed to switch to Trelegy for co-pay card. LaSart had mild trace edema in her leg. Valsartan was added.

60.    On December 13, 2021, LaSart was seen for a follow-up with her PCP. She reported having episodes of feeling lightheaded and stumbling, feeling her toes "catching" when walking. Reported Celexa helping with her mood/anxiety and would like to increase the dose. She also requested to decrease the dose of Amlodipine/Valsartan. An ENG was discussed but deferred at this time. She was referred to an oral surgeon.

61.    On April 1, 2022, LaSart was seen for an annual exam. She continued to have abdominal bloating, constipation, and nausea with improvement with stool softeners. Feels propranolol helped with her tremor, anxiety, and gait. EE did get her teeth pulled and has not had dentures made.

62.    On July 11, 2022, LaSart underwent a head CT scan.

63.    On October 7, 2022, LaSart underwent bilateral knee radiographs which showed mild to moderate bilateral medial tibiofemoral joint space narrowing. She reported having several falls and having sensation of her knees giving out with radial fracture in May. LaSart struck her head in July and had CT scan which was negative. She also fell 3 weeks ago but did not go to the ER and has a healing laceration on her left forehead. LaSart stated about a month ago she having hallucinations at night and believes she was seeing a young man in the house. On ROS LaSart had dizziness and lightheadedness and her tremor was worse with stress and anxiety. X-rays of her knees showed mild to moderate bilateral medial tibiofemoral joint space narrowing.

64.    On November 16, 2022, LaSart was seen by her PCP after she was hospitalized for psychosis. She continued to have visual/auditory hallucinations and had gone to the

hospital but felt safe to go home. She did have some rectal bleeding and was found to have rectal prolapse that was reduced. When the problem continued she presented to another ER and had lab testing, chest x-ray and EKG. She was made a 96-hour hold and started on Rexulti and her Celexa dose was reduced to 10mg. At this appointment she was accompanied by her daughter who has been providing oversight of medications and follow up. LaSart reported LE edema despite taking Furosemide and potassium daily. She also reported low and upper back pain. She was to double her furosemide and potassium and return in 3-5 days. If she had continued bleeding or prolapse she was to be referred to colorectal surgery.

65.    On November 18, 2022, LaSart had a DEXA scan which showed low bone mass/osteopenia.

66.    On April 7, 2023, LaSart was evaluated due to a recent syncopal episode in the bathroom and another episode where she fell in her bedroom. She was recommended to reduce Furosemide to 5 days weekly and recheck labs in 3 months. Slightly anemic and rechecked her blood count, iron studies, and B12 at that time as well. Her PCP opined that all of these have been associated with diaphoresis suggesting vasovagal. He planned to get a 30-day event monitor.

67.    On November 7, 2023, LaSart underwent a cervical spine radiograph which showed "question anterolisthesis of C7 and T1." The lumbar radiographs showed evidence of anterolisthesis of L4 on L5.

68.    On November 8, 2023, Dr. Eric Baker completed an Attending Physician Statement, advising she was unable to work due to failed back syndrome of lumbar spine, lumbar spinal stenosis and cervical degenerative disc disease. Dr. Baker indicated restrictions and

limitations of no bending, squatting, no lifting over 10 lbs., requiring frequent breaks and to sit. No repetitive upper extremity use.

69.     On November 17, 2023, LaSart underwent x-ray imaging studies of her cervical, thoracic, and lumbar spine at St. Luke's Primary Care. These studies revealed significant abnormalities, including degenerative sclerosis disc spaces at C3-4 and C7-T1, possible anterolisthesis, an 8.1 millimeter anterolisthesis of L4 on L5, and thoracolumbar dextroscoliosis. LaSart's medications included gabapentin 3 times a day for neck and back pain. Other medication management included aspirin, atorvastatin, brexipiprazole, Zyrtec, citalopram, dextroamphetamine-amphetamine, Estratest, Flonase, Trelegy Ellipta, hydrocodone/acetaminophen, ibuprofen, and the imipramine.

70.     On January 25, 2024, LaSart was seen again at St. Luke's where she reported that she continued to suffer from chronic low back pain. Her prescription for gabapentin was discontinued and replaced by one for Lyrica.

71.     On February 7, 2024, LaSart returned to St. Luke's for a neurosurgical consult performed by Jamie Sloan, DC, MMS, PA-C. Her symptoms included low back pain, bilateral lower extremity pain/weakness, loss of dexterity, grip weakness, and dropping objects. LaSart was myelopathic on exam and exhibited evidence of an anterolisthesis just below her previous cervical fusion at C7-T1. Sloan noted that LaSart's symptoms sounded claudicant in nature. Cervical and lumbar MRIs were ordered.

72.     On February 19, 2024, LaSart underwent a lumbar MRI that showed, among other things, multilevel neural foraminal narrowing and stenosis, advanced degenerative disc disease and degenerative spondyloarthropathy superimposed on scoliosis and extensive postoperative 4 changes. The cervical MRI was performed on the same date and showed

severe spinal canal stenosis at C3-4, multilevel neural foraminal narrowing, extensive postoperative changes, and a congenital fusion at C2-C3

73.    On March 1, 2024, LaSart was seen via video by Sloan to discuss the MRI results. Due to the severe cervical stenosis with spinal cord compression at C3-4, Sloan recommended that LaSart be seen by one of St. Luke's complex spine surgeons.

74.    On March 19, 2024, LaSart was seen at the Pain Management Clinic by Mark Bilezikan, MD. After an examination, Dr. Bilezikan noted, "Patient's current low level of function and low level of activity in addition to her history of multiple surgeries and possible chronic nerve damage have resulted in patient being very weak and having difficulty with day-to-day activities." Dr. Bilezikan did not recommend any surgical procedures until after conservative measures, like physical therapy, were tried.

75.    On April 4, 2024, LaSart was seen by Gurpreet Gandhoke, MD for a surgical consultation. On examination, he found that she was myelopathic. After reviewing all of the films, Dr. Gandhoke offered a posterior C3-C4 laminectomy with C3-C4 lateral mass fusion. They discussed June as a potential surgery date.

76.    On April 11, 2024, LaSart returned to Dr. Baker for a general physical. She reported increase episodes of syncope, the most recent one 3 days before her visit when she fell down and struck a small table. Dr. Baker noted that LaSart's blood pressure had been running low. Dr. Baker's plan included an EEG, consideration of a tilt table test, and a loop recorder.

77.    On June 12, 2024, Dr. Gandhoke performed the posterior C3-C4 laminectomy with C3-C4 lateral mass fusion.

78.   On June 25, 2024, LaSart was seen for a follow up with Dr. Gandhoke and also for an initial consultation with cardiology for her syncopal type events. The cardiologist, Michael Giocondo, recommended a tilt-table test followed by the placement of an implantable loop recorder. It was noted during the exam that LaSart's heartbeat was regular. It was also noted that LaSart had stopped driving a vehicle due to the unpredictability of her syncopal episodes.

79.   On July 29, 2024, LaSart underwent loop recorder implanting. On the same day, a tilt table test was administered.

80.   On September 6, 2024, LaSart returned to Dr. Gandhoke's group. Although she reported improved symptoms following the cervical fusion, she reported an increase in her low back pain. Surgical intervention was discussed, but LaSart was advised that surgery would be very involved, take 6-7 hours, and recovery would last up to a year. Both doctor and patient decided to wait to see how she recovered from her cervical fusion before making a decision on lumbar surgery.

81.   On October 15, 2024, LaSart returned to Dr. Baker. She reported continued back pain. Dr. Baker refilled her prescription for hydrocodone. They also discussed different physical therapy exercises. Her next appointment is scheduled for April 2025.

82.   LaSart has at all relevant times met the definition of "Disability" under the Plan and is entitled to benefits.

83.   LaSart appealed Unum's denial of her claim for benefits.

84.   In response to LaSart's appeal Unum referred her claim for medical review to Unum employee Elizabeth Eatmon, RN and Dr. Howard Grattan.

85.     Both Eatmon, RN, and Dr. Grattan opined that LaSart did not suffer from a single restriction or limitation.

86.     LaSart is 64 years old. Eatmon, RN, and Dr. Grattan did not consider LaSart's age when determining whether she has restrictions or limitations.

87.     Dr. Grattan made no effort whatsoever to contact LaSart's treating physicians and providers.

88.     In his report, Dr. Grattan cherry-picked records and provided grossly incomplete summaries of those records ignoring, for example, LaSart's reports of persistent right-sided neck pain, increase in bilateral hand weakness, degradation in her fine motor skills, dropping objects more frequently, increased awareness of back pain and stiffness when moving from a seated position to a standing position and vice-versa, and bilateral radiculopathy radiating from her lower back down the back of both legs.

89.     Dr. Grattan did not make any effort to analyze peer review findings by Unum clinical reviewers inconsistent with his own findings or explain why his report disagreed with them.

90.     Dr. Grattan did not acknowledge a multitude of LaSart's abnormal findings or explain why they were insufficient to result in functional impairments.

91.     Neither Eatmon, RN, nor Dr. Gratton reviewed LaSart's occupational requirements, but both found LaSart unrestricted from performing any level of activity.

92.     Neither Eatmon, RN, nor Dr. Gratton performed a function-by-function analysis in their review.

93.     Neither Eatmon, RN, nor Dr. Gratton met with, treated, or otherwise interacted with LaSart.

94.    On February 20, 2025, Unum upheld its denial of benefits.

95.    Unum based this second denial on the review performed by Eatmon, RN, and Dr. Gratton.

96.    LaSart has exhausted her administrative remedies and Unum refuses to take further action in connection with her claim.

<u>CAUSES OF ACTION</u>

COUNT I
29  U.S.C. § 1132(a)(1)(B) – WRONGFUL DENIAL OF BENEFITS

97.    LaSart realleges the preceding paragraphs as if fully set forth herein.

98.    LaSart is entitled to all unpaid and accrued LTD benefits, as Unum:

    a.    Made an unfavorable decision without substantial evidence;

    b.    Failed to properly consider LaSart's medical impairments and resulting limitations; and

    c.    Issued an unfavorable decision that was arbitrary and capricious.

99.    Unum has not satisfied its obligation to pay LaSart's LTD benefits.

100.    Unum denied LTD benefits when the applicable medical record supports upholding LTD benefits.

101.    WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(g), LaSart prays for judgment against Unum for unpaid LTD benefits, attorney's fees, costs, and prejudgment interest.

COUNT II
29  U.S.C. § 1132(a)(3) – BREACH OF FIDUCIARY DUTY

102.    LaSart realleges the preceding paragraphs as if fully set forth herein.

103.    Under 29 U.S.C. § 1002(21)(A), a fiduciary is one who:

"exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property or such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

104.    29 U.S.C. § 1104(a)(1)(A) describes the fiduciary standard of care:

"a fiduciary shall discharge her duties with respect to a plan solely in the interest of the participants and beneficiaries and – for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

105.    Unum, the Plan's designated claims administrator, is a fiduciary.

106.    Unum participated in and benefitted from the Plan as previously indicated.

107.    Unum's claims management practices are motivated by financial incentives in its administrative services agreement with HCA.

108.    As the payor of benefits and the entity responsible for exercising discretion in claims administration, Unum operates under an inherent conflict of interest.

109.    A higher than marketplace quality standard, as set forth in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 (2008) governs the actions of a fiduciary.

110.    Unum breached its fiduciary duty in:

a.    Failing to comply with its internal guidelines and claims handling procedures. Its claim handlers did not comply with documented instructions involving the administration of disability claims, including its procedures involving coverage and eligibility determinations;

b.    Refusing to administer the claim when the 180-day deadline was extended by National Emergency;

c.    Failing to properly administer the claim;

      d.   Engaging in a structural conflict of interest by assuming the role of both claims administrator and payor of benefits;

      e.   Failing to properly consider competent medical and vocational opinion evidence, and/or failing to specifically explain why it did not agree with such evidence;

      f.   Failing to provide a copy of the applicable policy and documents; and

      g.   Refusing to utilize fully executed authorizations to attempt to obtain all relevant evidence to LaSart's claim for benefits;

111. Unum denied LaSart's LTD benefits for the purpose of elevating its financial interests. In doing so, it breached its fiduciary duties.

112. Unum failed to discharge its duties solely in the interests of its participants and beneficiaries. It acted with both a conflict of interest and breached its fiduciary duty to both LaSart and the Plan's participants and beneficiaries generally.

113. Unum's improper conduct demonstrates that ordinary relief under § 1132(a)(1)(B) is not an adequate remedy.

114. Unum's violations of regulations alone allow LaSart the right to pursue any remedy under Section 502(a) of ERISA, including § 1132(a)(3). 29 C.F.R. § 2560.503-1(1)(2)(i).

115. Unum's violations of federal regulation also subject its decision to *de novo* review.

116. WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(3), § 1109, and § 1132(a)(2), LaSart prays for an order that Unum retrain its employees consistent with ERISA fiduciary obligations and federal regulations; for reformation of its services agreement with the plan administrator consistent with ERISA fiduciary obligations and federal regulations; for an injunction preventing further unlawful acts by Unum in its fiduciary capacity; for an equitable accounting of benefits that Unum has withheld; for the disgorgement of

profits enjoyed by Unum in withholding benefits; for restitution under a theory of surcharge; for the Court's imposition of a constructive trust; for an award of attorney fees; and for further relief as the Court deems just.

Respectfully submitted,

BURNETTDRISKILL, Attorneys

By: /s/ Derrick A. Pearce
Derrick A. Pearce, # 16752
Benjamin Narrell, # 79228
103 W 26th Ave., Ste. 290
North Kansas City, MO  64116
P: 816.781.4836
F: 816.792.3634
dpearce@burnettdriskill.com
bnarrell@burnettdriskill.com
ATTORNEYS FOR PLAINTIFF